UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>    v.<br><br>GARY J. CONFREDO,<br><br>      Defendant. | 97 Cr. 1045 (LBS)<br><br>**MEMORANDUM<br>& ORDER** |

SAND, J.

  Defendant Gary J. Confredo was sentenced by this Court to 205 months of incarceration upon his guilty plea to bank fraud and four associated offenses, for his leadership of a scheme that submitted hundreds of fraudulent loan applications. On appeal of his sentence, the United States Court of Appeals for the Second Circuit remanded the case to this Court for reconsideration of the sentence, directing this Court to allow Defendant the opportunity to prove his intent to cause a loss less than the aggregate face value of the fraudulent loan applications he submitted. The Court held a hearing on this issue on November 10, 2010.

  Based upon the record, including the evidence presented at that hearing, the Court declines to resentence Defendant.

### I. Background

  The facts of Defendant's criminal conduct and conviction are fully recited in the opinion of the United States Court of Appeals for the Second Circuit remanding the case to this Court for resentencing. *United States v. Confredo*, 528 F.3d 143, 145–46 (2d Cir. 2008) ("*Confredo II*"). A discussion of this case's procedural history follows.

1

On February 22, 1999, Defendant pled guilty to one count of bank fraud in violation of 18 U.S.C. § 1344, two counts of false statements on a loan application in violation of 18 U.S.C. § 1014, one count of false statement to a federal law enforcement officer in violation of 18 U.S.C. § 1001, and one count of attempted witness tampering in violation of 18 U.S.C. § 1512.  The Court orally announced a sentence of 262 months imprisonment on January 27, 2000.  Pursuant to the Sentencing Guidelines, the Court began with a base offense level of 6, added 12 levels for reasons not in dispute on appeal, and added another 16 levels for a loss of more than $20 million but less than $40 million. United States Sentencing Commission, *Guidelines Manual*, §§ 2F1.1(a), (b)(1)(Q) (Nov. 1997) ("U.S.S.G.").  The Court then added three additional levels because of the four counts of Defendant's conviction that involved offenses committed while on release after his arrest, yielding an adjusted offense level of 37.  U.S.S.G. § 2J1.7.  Under Criminal History Category I, this offense level yielded a sentencing range of 210 to 262 months. Defendant did not object to the loss amount of $24.2 million contained in the Pre-Sentence Report ("PSR"), an estimate of the total amount requested in the fraudulent loan applications he prepared.  Defendant requested a downward departure, contending that the loss amount overstated the actual loss; the Court denied this request.

In its oral imposition of sentence and its written judgment of conviction, this Court distributed the sentence among the counts for a total of only 230 months, and did not apportion the sentence between the underlying offenses and the enhancement, as required by 18 U.S.C. § 3147.  Defendant appealed his sentence on these grounds; he also challenged the loss causation calculation, and argued that the sentence enhancement for offenses committed while on release was invalidated by *Apprendi v. New Jersey*, 530

U.S. 466 (2000).  In a summary order issued on January 12, 2001, the United States Court of Appeals for the Second Circuit vacated and remanded this Court's sentence for clarification and resentencing, and allowed this Court to determine (1) whether *Apprendi* was applicable to the enhancement for offenses while on release, and (2) whether this Court's calculation of the loss caused by Defendant's fraud was correct.  *United States v. Confredo*, 1 Fed. Appx. 68 (2d Cir. 2001) ("*Confredo I*").

On July 20, 1999, Defendant pled guilty in the Eastern District of New York to one count of money laundering, involving some of the proceeds of his fraudulent loan scheme.  No. 98 Cr. 1122 (JM).  In March 2001, the late Judge Jacob Mishler imposed a 57-month sentence, and stated his intention that the sentence run concurrently with the sentence that this Court would impose on remand in the instant case.  Judge Mishler recognized, however, that he did not have the authority to impose such a sentence, since the resentencing in the instant case had not yet taken place.  The parties did not seek resentencing until 2006.

On June 6, 2006, this Court held a hearing on Defendant's resentencing, specifically (1) the calculation of loss and (2) the *Apprendi* challenge to the three-level enhancement for offenses committed while Defendant was on release.  The Court concluded that the loss amount equaled the face value of all the fraudulent loans Defendant prepared, rejected his *Apprendi* challenge, and held that his sentence would remain within the original Guidelines range of 210 to 262 months.  To implement Judge Mishler's intention that the 57-month sentence he imposed run concurrently with the sentence in this case, this Court subtracted that sentence from the 262 months it would have otherwise imposed, resulting in a sentence of 205 months.

Defendant again appealed his sentence, contending that his intended loss was more than $10 million but less than $20 million; that the loss enhancement for his fraud conviction should have been 15 levels instead of 16, a difference of 27 months; and again raising his *Apprendi* challenge.  On June 10, 2008, the Second Circuit remanded the case back to this Court for reconsideration of the sentence, directing the Court to determine whether Defendant had proven his intent to cause a loss less than the aggregate face value of the loans, and if so, base the loss calculation only on the intended loss, unless the actual loss was higher.  *Confredo II*, 528 F.3d at 152–53.  The Second Circuit also rejected Defendant's *Apprendi* challenge.  *Id.* at 156.  On November 10, 2010, this Court held a hearing on the issue of Defendant's intended loss.  Defendant testified, and was cross-examined by the Government.

## II. Discussion

### A. Scope of Remand

Defendant now argues that resentencing is required in light of newly presented post-sentence mitigating circumstances, which he raises in sealed submissions.  He claims that he must be heard on these mitigating circumstances even if he does not carry his burden of proof on loss causation.  The Government contends that this is a *Crosby* remand, where the Court "may consider, based on the circumstances at the time of the original sentence, *whether* to resentence" Defendant.  *United States v. Crosby*, 397 F.3d 103, 120 (2d Cir. 2005) (emphasis in original).  Against this, Defendant cites *United States v. Lake*, 419 F.3d 111 (2d Cir. 2005), to argue that resentencing is required when an appellate court remands a sentence based on preserved error, even if the court does not vacate the sentence.  He claims that error was preserved in this case, and that the *Crosby*

remand is only available when it is uncertain whether the appellant was prejudiced by the district court's error.

Defendant is wrong on both points. First, the Second Circuit noted this Court's ruling in the June 2006 resentencing that the alleged error was not preserved, and despite some uncertainty on this issue, applied "the somewhat relaxed application of plain error review that we and other courts have on occasion deemed appropriate for unpreserved sentencing errors." *Confredo II*, 528 F.3d at 149. In other words, the Second Circuit chose to treat this case as involving unpreserved error. Second, Defendant misconstrues *Crosby*. In that case, the Second Circuit held that in instances of a procedural error in sentencing, "a remand to afford the judge an opportunity to determine whether the original sentence would have been nontrivially different . . . will normally be necessary to determine whether the error is harmless, or, if not properly preserved, is available for review under plain error analysis." *Crosby*, 397 F.3d at 119. Here, the Second Circuit declined to hold that this Court had even committed error, harmless or not. The court cited "uncertainty as to the standard of review, arising from uncertainty" as to whether this Court's sentence was based on "a finding of fact" or "an interpretation of the relevant guideline[.]" *Confredo II*, 528 F.3d at 149-50. Therefore, the Second Circuit's remand did not mandate resentencing; it only mandated a hearing on whether resentencing is necessary. "We will therefore remand to afford Judge Sand *an opportunity to reconsider* the intended loss in accordance with this opinion . . . The case is remanded for reconsideration of the sentence." *Id.* at 152, 156 (emphasis added). In other words, this is a *Crosby* remand, and the Second Circuit has "repeatedly held that a district court is not to consider" post-conviction rehabilitation on such a remand. *United States v.*

5

*Ferrell*, 485 F.3d 687, 688 (2d Cir. 2007) (per curiam).  "Rather, on a *Crosby* remand, a district court must first make a threshold determination of whether, based on the circumstances at the time of the original sentence, it would have imposed a different sentence . . . Only if the district court answers the threshold determination in the affirmative does a resentencing occur."  *Id.* at 688-89 (internal citations and quotation marks omitted).

Accordingly, to obtain resentencing in light of his alleged post-sentence mitigating circumstances, Defendant must first demonstrate that such resentencing is warranted by carrying his burden of proof with regard to the loss causation issue remanded to this Court by the Second Circuit.

### B.  Loss Causation

In its decision remanding Defendant's sentence, the Second Circuit directed this Court to "determine the extent, if any, to which Defendant has proven a subjective intent to cause a loss of less than the aggregate amount of the loans, in which event the applicable loss calculation should be based only on the intended loss, unless the actual loss is higher."  *Confredo II*, 528 F.3d at 152–53.

The Government now argues that Defendant's relevant conduct entailed a total intended loss of $33,225,108.00, and an actual loss of $20,038,270.06.  Gov. Post-Hearing Mem. at 2.  As evidence, the Government submits a list of "Confredo Related Financing," *id.* Ex. B, based on documents seized from Defendant's office, and claims that all the loans included in the $33.2 million figure were initiated by Defendant, though some were completed by his associates.  *Id.* at 19.  The Government may be correct in asserting that Defendant would be criminally responsible for a total intended loss of

6

$33.2 million.  Moreover, Defendant admitted to a scheme of creating fraudulent equipment leases to yield additional cash for his clients, and Defendant does not account for these additional losses.  *See* Transcript of February 22, 1999 Hearing at 16–17 (plea allocution); Transcript of November 10, 2010 Hearing at 34–37 (on remand). Nevertheless, the Government has not fully established its claim of a $33.2 million loss amount, because it has not provided documentary evidence showing the extent of Defendant's specific involvement with the loans on its lists.  Therefore, the Court does not rely upon the Government's figure, and instead relies upon the $24.2 million figure contained in the Pre-Sentence Report dated September 30, 2010.  PSR ¶¶ 33, 40–41.  The Second Circuit relied upon this figure as well.  *Confredo II*, 528 F.3d at 146–47.

Defendant claims that he intended a loss less than the $24.2 million face value of the fraudulent loans for three reasons: based on his experience as a loan officer, he expected that (1) his customers would repay a portion of the loans, (2) some of the loans would be denied, and (3) others would be granted for less than the full amount.  He alleges that he intended an aggregate loss equal to two-thirds of the face value of the loans, a sum of approximately $16.1 million.  This calculation would result in a 15-level enhancement for Defendant's fraud count for a loss between $10 million and $20 million, rather than the 16-level enhancement originally imposed for a loss between $20 million and $40 million.  U.S.S.G. § 2F1.1(b).

At the hearing on this remand, Defendant testified to his intent in submitting the fraudulent loan applications.  Upon cross-examination, he stated the following:

> [The Government]: To the best of your ability, it was your intent to make sure that each application you submitted was granted, correct?
> [Defendant]: Yes.

7

Transcript of November 10, 2010 Hearing at 32:16–18.  This admission shows Defendant's intent that each individual loan application be approved, even if the actual aggregate loss was less than the aggregate face value of the loans.  Defendant did not file any individual loan application with the intent or expectation that it would be rejected.  If a fraudulent loan application he filed was rejected, he would file a subsequent application or make alternative arrangements such as the fraudulent equipment leases, but again, his intention was for each particular application to be approved.

In the first of two hypotheticals, the Second Circuit explained that a defendant who applied, or caused someone else to apply, for a loan expecting that a portion of it would be repaid only intended the loss of the remainder, unless the actual loss was greater.  *Confredo II*, 528 F.3d at 152.  In other words, Defendant's expectation of the borrower's repayment would reduce his intended loss.  But at the hearing on remand, Defendant never raised this issue; his only statements on it are contained in his Declaration filed with his Pre-Sentencing Memorandum on Remand ("Confredo Dec.").  He claimed that "I expected my customers to pay at least the interest on the loans I got them."  Confredo Dec. ¶ 9.  Interest is not included in the loss calculation, so these statements are immaterial.  He then asserted that "I also expected that at least some of my customers would also repay some of the princip[al] on the loans.  This is because many of my customers were legitimate business[es] which I believed would do their best to actually pay off their loans[.]"  *Id.*  However, throughout the long history of this case, Defendant has never alleged any aggregate dollar amount or percentage that he expected his customers would repay.  Even if this Court were to credit Defendant's self-serving

testimony, he fails to suggest how we should quantify his expectations of repayment.[1] Moreover, he has never provided any evidence that when he submitted any individual application he believed it would be repaid, and in what amount. As Defendant concedes, *see* Def. Post-Hearing Mem. at 6 n.4, he has not carried his burden of proving the specific amount of repayment that he believed would offset the losses caused by his fraudulent loans, either individually or in the aggregate. Therefore, the Second Circuit's first hypothetical does not apply to Defendant.

In its other hypothetical, the Second Circuit stated that a defendant who applied, or caused someone else to apply, for multiple loans expecting some of them to be rejected only intended the loss of the remaining loans, unless all of the loans were accepted and none repaid. *Confredo II*, 528 F.3d at 152. Accordingly, Defendant now claims that he expected one-third of the loans "would be denied outright," based on his experience as a loan officer, and filed applications accordingly. Confredo Dec. ¶ 8. But he contradicts this claim in other testimony. Reviewing the Citibank loans, which accounted for over $20 million of the $24.2 million fraudulent loan applications, he admitted to his expectation that the bank would approve loans that it in fact rejected. "One-third of those were denied in their entirety, *despite the fact that I provided rosy financial statements and I thought that the customer would pass on the credit.*" Tr. 28:13–15 (emphasis added). Defendant's usual strategy did not entail playing the averages by submitting multiple loans for a client to different banks, expecting that some would be rejected. Instead, he would generally submit a client's application to a single bank, and if he was able to get a "customer" the amount he or she requested "and it was sufficient, I wouldn't resubmit it to another bank." Tr. 33: 9–11. This was a sequential, not a scattershot

---

[1] Some amounts have been repaid by some borrowers. PSR ¶ 43–45, 47–49.

approach.  Defendant's alleged expectation that one-third of the loans would be rejected is a *post hoc* assessment of his success rate, not a description of his strategy and intent. Defendant has not carried his burden of proof to demonstrate that his expectations of loan rejection lowered his intended loss.  His conduct did not fit either of the two hypotheticals in the Second Circuit's opinion.

Defendant focuses on a third explanation of his conduct: in filling out fraudulent applications, he would "upgrade the loan and ask for a higher amount" for first-time borrowers with little or no credit history, expecting that lenders would "conservatively lower the amount that they approve[.]"  Tr. 23:2–7.  In support, he testified that when he worked as a loan officer, the general practice of the banks that employed him was to "knock down the approval . . . 25 to 30 percent" for "first-time loan applications by small businesses with no prior credit history with the bank."  Tr. 19:11–12, 20–21.

Defendant has failed to prove these assertions.  First, all of the evidence he offers comes in the form of self-serving testimony without any objective corroboration, with respect to both the instant offenses and his experience as a loan officer servicing legitimate loans.  Second, Defendant's statements on his alleged markup are contradictory.  In an interview with the Probation Department after the Second Circuit held that his intended loss was at issue, Defendant claimed that his customary markup was 35% to 50%, not the one-third or less alleged at the hearing on remand.  PSR ¶ 62; Tr. 23: 1–3 (alleging 15% to 33% markup), 36: 9–10 (alleging 33% markup).

Third, Defendant's claim that he expected reduced loan amounts rests on a fundamental contradiction.  He supposedly derived these expectations from his work experience servicing truthful loan applications, but in this criminal scheme he submitted

10

fraudulent applications.  His employment as a loan officer, before he was fired for arranging loans for relatives, taught him "how to put together a loan package that would be approved."  Tr. 24:16–19.  Accordingly, in his fraudulent loan applications he made his best efforts to craft "rosy" falsehoods that would be more appealing to a loan officer than the norm of legitimate applications.  Tr. 28:14.  Defendant did not aim merely to match the acceptance rates of truthful applications; instead, he strove to beat the odds by submitting fictitious applications whose fabrications were designed precisely to fit the banks' requirements.  Therefore, the claim that his past experience led him to expect an average approval of two-thirds the amount requested is suspect.

Fourth, Defendant asserts that he developed his alleged expectations of "55-60%" approval, which he later calls an average of "no more than 70%" of the amount requested, "[b]y the end of 1995," approximately a year and half after the criminal scheme allegedly began "in mid-1993" after he lost his job as a loan officer.  Confredo Dec. ¶ 8.  This account contradicts Defendant's own testimony that he developed his expectations of two-thirds approval years earlier, during his career servicing legitimate loan applications.  Tr. 22:4–23:10.  Defendant fails to present any lists or charts of loans substantiating his claim that the results of his scheme during its first years "taught [him] to expect" two-thirds approval.[2]  Confredo Dec. ¶ 8.  Moreover, even if Defendant's account is accepted, it follows that Defendant could not have anticipated two-thirds approval for the entire $24.2 million in fraudulent loan applications he submitted from 1993 onward.  Some reduction of this amount is necessary for those applications submitted before Defendant allegedly developed his two-thirds rule toward the end of

---

[2] The Government claims that out of 227 fraudulent loan applications submitted or initiated by Defendant, only 8 were granted for one-third less than requested, and out of 135 business entities seeking financing through Defendant, only 12 failed to win approval.  Gov. Post-Hearing Mem., Ex. C.

11

1995, but Defendant has not provided the information necessary to make these calculations. Given these myriad inconsistencies in Defendant's testimony, and its complete lack of relevant objective corroboration, this Court does not credit his testimony regarding his alleged expectations that banks would reduce the amounts awarded for his fraudulent loan applications.

Finally, Defendant's alleged figure of overall intended loss, $16.1 million, does not accord with his three theories of intended loss. He claims that he marked up all the loans by one-third, on average, but also claims that he expected one-third of all his applications to be denied outright. This would reduce his $16.1 million intended loss figure, approximately 66.7% of the face value of the loans, to $10.8 million, approximately 44.6% of the face value of the loans. Defendant's claim that he expected some borrowers to repay the loans would further reduce his intended loss figure, though as noted above, his claim is too vague for any calculations. Defendant's three theories and his claim of a $16.1 million overall intended loss do not add up, casting further doubt on his credibility.

In sum, Defendant has failed to carry his evidentiary burden of establishing that he intended a loss smaller than the aggregate face value of the fraudulent loan applications he submitted, and has therefore failed to demonstrate why a resentencing is necessary. Therefore, the Court may not consider his alleged post-sentence mitigating circumstances, discussed *supra.*

### C. Rejection of Defendant's Proposed Expert Witness

On June 11, 2010, Defendant's counsel, appointed pursuant to the Criminal Justice Act, 18 U.S.C. § 3006A, submitted an *ex parte* request to authorize expenditures

for an expert witness on bank lending practices. The proposed witness would have corroborated the reasonableness of Defendant's expectation that less than $20 million of the loans for which he submitted fraudulent applications would have been approved. On June 14, 2010, this Court denied the request. As this Court stated in the resentencing hearing, Defendant's application was denied because the witness's testimony would have been based on truthful loan applications. Therefore, it would have been of limited value for interpreting fraudulent loan applications fabricated by Defendant to meet lenders' criteria. Tr. 53:15–54:6.

### III. Conclusion

For the reasons set forth above, and in accordance with the remand from the Second Circuit, Defendant's request for resentencing is denied. The sentence of 205 months imprisonment imposed on June 6, 2006 remains in effect.

SO ORDERED.

Dated: December 20, 2010
New York, NY

_____
U.S.D.J.

13